RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0078p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

JOHN RUSSELL, et al.,

        *Plaintiffs-Appellees,*

        *v.*

ALISON LUNDERGAN-GRIMES, Secretary of State of the Commonwealth of Kentucky, et al.,

        *Defendants-Appellants.*

No. 14-6262

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:14-cv-00112—William O. Bertelsman, District Judge.

Argued: March 3, 2015

Decided and Filed: April 28, 2015

Before: BATCHELDER, McKEAGUE, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Jacob C. Walbourn, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellant Conway. Lynn Sowards Zellen, OFFICE OF THE SECRETARY OF STATE OF THE COMMONWEALTH OF KENTUCKY, Frankfort, Kentucky, for Secretary of State and State Board of Elections Appellants. Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Crestview Hills, Kentucky, for Appellees. **ON BRIEF:** Jacob C. Walbourn, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, Lynn Sowards Zellen, OFFICE OF THE SECRETARY OF STATE OF THE COMMONWEALTH OF KENTUCKY, Frankfort, Kentucky, Jessica R.C. Malloy, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellants. Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Crestview Hills, Kentucky, Brandon N. Voelker, Cold Spring, Kentucky, Jack S. Gatlin, Thomas B. Bruns, FREUND, FREEZE & ARNOLD, Ft. Mitchell, Kentucky, for Appellees.

_____

**OPINION**

_____

ALICE M. BATCHELDER, Circuit Judge. This case requires the balancing of First Amendment rights with the right to cast a ballot that is both tabulated and undiluted. Those voting rights are achieved by safeguarding the integrity of the ballot box against fraud, intimidation, and other degradations of the electoral process. Plaintiffs John Russell and Campbell County Auto Body, Inc. (collectively "Russell") brought suit under 42 U.S.C. § 1983 against Kentucky Secretary of State Alison Lundergan-Grimes, Kentucky Attorney General Jack Conway, and various other state and local officials, alleging that Kentucky Revised Statute § 117.235(3), which creates a 300-foot no-political-speech buffer zone around polling locations on Election Day, violates Russell's free-speech rights. Russell's business property is 150 feet from a polling location, with a four-lane highway and guardrails between. Citing the statute, Sheriff's deputies have removed political signs from his property on previous election days, and the statute's language prohibits Russell from—on his own property—waving signs and offering campaign literature to passersby. Defendants moved to dismiss the case for lack of subject-matter jurisdiction and failure to state a claim. The district court denied those motions to dismiss, held a bench trial, declared § 117.235(3) unconstitutional, and permanently enjoined its enforcement. We granted a partial stay of that injunction because it was issued only days before the 2014 general election, and expedited this appeal. We now hold that we have jurisdiction over this case, that the Eleventh Amendment does not bar suit against any of the remaining defendants, and that the statute facially violates the First Amendment because Kentucky failed to carry its burden of showing why it required a no-political-speech zone vastly larger than the Supreme Court has previously upheld. We therefore AFFIRM the judgment of the district court.

### I. FACTS AND PROCEDURAL HISTORY

The Kentucky statute challenged here provides in relevant part, and with various qualifying provisions not relevant here:

> No person shall electioneer at the polling place on the day of any election, as established in KRS 118.025, within a distance of three hundred (300) feet of any

> entrance to a building in which a voting machine is located. . . . Electioneering shall include the displaying of signs, the distribution of campaign literature, cards, or handbills, the soliciting of signatures to any petition, or the solicitation of votes for or against any bona fide candidate or ballot question in a manner which expressly advocates the passage or defeat of the ballot question, but shall not include exit polling or other exceptions established by the State Board of Elections through the promulgation of administrative regulations.

Ky. Rev. Stat. § 117.235(3). The Kentucky State Board of Elections (KSBE) has promulgated only one exception to these strictures, allowing bumper stickers on cars that are parked at a polling location for only a reasonable amount of time necessary for the driver to cast a ballot. 31 Ky. Admin. Regs. 4:170.

John Russell is president and an owner of Campbell County Auto Body, Inc. Auto Body's property is approximately 150 feet from a polling location in Cold Spring, Kentucky, separated from the polling location by a four-lane highway and by guardrails along the roadside. Before both the primary and general elections in 2012 and 2014, both personally and as president of the company, Russell permitted several political candidates he supports to place political signs on his business property. These were signs that were affixed to the ground, and variously expressed support for candidates of both major political parties. From Auto Body's premises on election days, Russell also holds and waves signs and offers to passersby campaign literature for candidates he supports. On the days of the 2012 primary and general elections, over Russell's objections, unidentified deputy sheriffs removed the signs because they were in violation of the statute. Deputies did the same over Russell's repeated objections on May 20, 2014, the day of the primary election. Russell testified, and the district court found, that on Election Day 2014, and for future elections, it was and is Russell's intention "to walk across the highway and stand on the grass in front of the Polling Place between 200 and 300 feet from its entrance . . . to waive [sic] or hold [] signs" and hand out literature to any voter who requests it. Russell fears prosecution under the statute for these activities.

Russell brought this action under 42 U.S.C. § 1983, alleging that § 117.235(3) violates Russell's rights under the Free Speech Clause, both facially and as applied. Defendants include state officials and members of KSBE: Kentucky Secretary of State Alison Lundergan-Grimes, who is also Chair of KSBE; Kentucky Attorney General Jack Conway; KSBE Executive

Director Maryellen Allen; and KSBE members David Cross, John Hampton, Stephen Huffman, Denise May, George Russell, and Ronald Morgan. The other defendants are county officials of Campbell County: County Clerk Jack Snodgrass, who is also a member of the Campbell County Board of Elections (CCBE); Campbell County Sheriff Jeff Kidwell, also a member of CCBE; CCBE members John Fisher and Catherine Longshore; and Campbell County Deputy Sheriffs John Does 1–4. Each of these government actors was sued in his or her official capacity.

Russell filed his original complaint on June 16, 2014, seeking declaratory and injunctive relief. The state defendants filed two motions to dismiss, one for Conway under Federal Rule of Civil Procedure Rule 12(b)(6) for failure to state a claim, and another for Grimes and the KSBE defendants under both 12(b)(1) and 12(b)(6) for failure to state a claim and lack of subject-matter jurisdiction. The district court denied Defendants' motions to dismiss on September 15, 2014, after which Russell amended his complaint and also moved for a preliminary injunction. On October 3, Russell entered into a consent decree judgment with the county defendants, ensuring that they would not attempt to enforce the statute against him. With the parties' consent, the court consolidated the hearing on the motion for the preliminary injunction with a bench trial on the merits, *see* Fed. R. Civ. P. 65(a)(2), and heard arguments on October 13, 2014. The following day, the district court held § 117.235(3) invalid and issued a permanent injunction.

Kentucky brought an emergency appeal to this court. Consistent with the Supreme Court's clear instruction, we have held that "last-minute injunctions changing election procedures are strongly disfavored." *Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012) (per curiam). Accordingly, on October 17, 2014, we partially stayed the district court's order, thus ensuring that Kentucky would have some buffer-zone law in place for the imminent 2014 election, but refused to stay the order with respect to private property, thereby allowing Russell and others to exercise their free-speech rights on their own property on Election Day. *Russell v. Lundergan-Grimes*, 769 F.3d 919, 922 (6th Cir. 2014) (per curiam). Given that 2015 is a statewide election year in Kentucky and that the primary election is scheduled for May 19, 2015, we granted expedited review for this appeal.

No. 14-6262     *Russell, et al. v. Lundergan-Grimes, et al.*     Page 5

## II.  STANDARD OF REVIEW

We review de novo a motion to dismiss invoking Federal Rule of Civil Procedure 12(b)(6), construing the complaint in the light most favorable to the plaintiffs, accepting their well-pleaded factual allegations as true, and drawing all reasonable inferences in their favor. *See Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 562 (6th Cir. 2013) (en banc). This standard generally governs our review of a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), *McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012), except that, like the district court, we do not presume the truth of factual allegations pertaining to our jurisdiction to hear the case, and the plaintiff still bears the burden of demonstrating jurisdiction, *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  Following a bench trial, "[w]e review the district court's conclusions of law de novo, and its findings of fact for clear error." *Dillon v. Cobra Power Corp.*, 560 F.3d 591, 599 (6th Cir. 2009) (italics omitted). We would normally review for abuse of discretion the scope of the injunctive relief granted by the district court.  *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir. 2011).  But here, the question of whether a state action is overbroad under the First Amendment, thus requiring facial invalidation and a permanent injunction sufficiently broad to bar completely the administration of the statute, is a question of law we review de novo.  *See, e.g.*, *Odle v. Decatur Cnty.*, 421 F.3d 386, 389 (6th Cir. 2005).

## III.  ANALYSIS

We must address four constitutional issues in this case, two pertaining to our ability to hear the case, one on the merits of the free-speech claim, and one on the scope of injunctive relief.

### A.

All of the defendants who bring this appeal are statewide officials, and all argue that the Eleventh Amendment bars suit against them.  As a threshold matter, we must determine whether the Eleventh Amendment bars on jurisdictional grounds this suit for declaratory and injunctive relief against any of them, and if so, whether we have Article III authority to decide this case. The State squarely raises this issue as a jurisdictional defect that is the State's first line of

defense, so we must decide it. If any one officer is shielded by the Eleventh Amendment, that individual defendant must be dismissed from the case. If all Defendants are protected by the Eleventh Amendment here, then while Russell's judicially cognizable injury is fairly traceable to Defendants, we would nonetheless lack the power to remedy the injury through a favorable ruling, in which event we would be required to order the district court to dismiss the entire suit for want of jurisdiction.

The circuits are split on whether the Eleventh Amendment is a jurisdictional bar. *See Nair v. Oakland Cnty. Cmty. Mental Health Auth.*, 443 F.3d 469, 473–77 (6th Cir. 2006). While the Eleventh Amendment's language is "strikingly similar" to the language in Article III that defines the jurisdiction of the federal judiciary, *id.* at 473, "[w]e have not spoken with one voice" on whether an Eleventh Amendment defense is jurisdictional and whether we must resolve Eleventh Amendment issues before addressing the merits of a case, *id.* at 474. "While the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power," nonetheless that jurisdictional component "is not coextensive with the limitations on judicial power in Article III." *Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998). The weight of our sovereign-immunity precedent leads us to conclude that we have already held that Eleventh Amendment issues are jurisdictional in nature. *See, e.g., Angel v. Kentucky*, 314 F.3d 262, 265 (6th Cir. 2002) ("We must therefore address the jurisdictional question that clearly exists, even though it was not addressed by the court below."); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Engler*, 304 F.3d 616, 618 (6th Cir. 2002) (declaring that "jurisdictional issues" such as Eleventh Amendment questions must "be addressed prior to reaching the merits"); *Childs v. Koosed*, No. 90-3449, 1991 U.S. App. LEXIS 4620, at *11, 1991 WL 33133, at *4 (6th Cir. Mar. 13, 1991) ("In view of the District Court's disposition of the claims on eleventh amendment grounds, the District Court was without jurisdiction to make the alternative ruling on the merits."). However, sovereign immunity has characteristics unlike other jurisdictional issues, since its contours are determined by a constitutional provision not found in Article III. *See Idaho v. Coer D'Alene Tribe*, 521 U.S. 261, 267–68 (1997). The Eleventh Amendment is *sui generis* as a jurisdictional issue, having a "quasi-jurisdictional nature," *United States ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*, 173 F.3d 890, 897 (D.C. Cir. 1999), one that can be waived or abrogated. Absent clearer instruction from the Supreme Court, consistent with

our circuit's precedent, we hold that rather than an affirmative defense, the Eleventh Amendment is a true jurisdictional bar that courts can—but are not required to—raise *sua sponte* at any stage in litigation, and, once raised as a jurisdictional defect, must be decided before the merits.

### 1.

The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The sovereign immunity guaranteed by this Amendment deprives federal courts of subject-matter jurisdiction when a citizen sues his own State unless the State waives its immunity or Congress abrogates that sovereign immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–100 (1984).

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). It is a suit against the State itself. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). The Eleventh Amendment bars many such suits. *Will*, 491 U.S. at 66. However, there is an exception to States' sovereign immunity under the doctrine announced in *Ex parte Young*, 209 U.S. 123 (1908), whereby "a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst*, 465 U.S. at 102. "In order to fall within the *Ex parte Young* exception, a claim must seek prospective relief to end a continuing violation of federal law." *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013). "*Young* does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute." *Children's Healthcare is a Legal Duty v. Deters*, 92 F.3d 1412, 1415 (6th Cir. 1996). With the local officials no longer parties to this case on appeal, the question becomes whether Defendants—each a state official sued in his or her official capacity only—can be subjected to suit under *Young*.

The clearest answer is for Attorney General Conway, who has "jurisdiction, concurrent with that of county and Commonwealth attorneys, to investigate and prosecute violations of the election laws." Ky. Rev. Stat. § 15.242; *see also id.* § 15.243(1) (providing that "the Attorney General . . . shall enforce all of the state's election laws by civil or criminal processes").

Conway therefore has ample authority to prosecute Russell criminally for violating § 117.235(3). The record indicates that Conway's office repeatedly fielded and investigated complaints of impermissible electioneering, and promised the public that it would pursue possible criminal sanctions. A plaintiff need not wait until a prosecutor initiates adverse action to have standing to sue to protect his First Amendment rights. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). It would be a perverse reading of *Young* to say that, although Russell might have an Article III injury before the Attorney General directly communicates his intent to prosecute him, the Eleventh Amendment would nonetheless simultaneously bar us from enjoining the Attorney General's initiating a prosecution. Rather, at the point that a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy this element of *Ex parte Young*. *See Young*, 209 U.S. at 154–55. Russell properly named Conway as a defendant, and the district court properly denied Conway's motion to dismiss.

It is a closer question for the remaining statewide defendants, but the answer remains the same. *Young* does not reach state officials who lack a "special relation to the particular statute" and "[are] not expressly directed to see to its enforcement." *Id.* at 157. And it requires more than a bare connection to administering a statute. "Holding that a state official's obligation to execute the laws is a sufficient connection to the enforcement of a challenged statute would extend *Young* beyond what the Supreme Court has intended and held." *Children's Healthcare*, 92 F.3d at 1416.

> This case is unlike *Children's Healthcare*, where we specifically noted that:
>
> this action also does not fall within the *Young* exception, because the plaintiffs do not seek to *enjoin* enforcement of an allegedly unconstitutional statute. Instead, the plaintiffs in effect pray that the federal courts *permit* a broader enforcement of certain statutes by striking down those provisions of the statutes which prevent their enforcement with respect to persons against whom the plaintiffs believe enforcement is proper. This would turn *Young* inside out.

*Id.* Here, we have the opposite situation—a much more common situation—of a plaintiff seeking to enjoin enforcement of a statute that he claims violates the First Amendment. While the challengers in *Children's Healthcare* were asking us to expand *Young*, Russell asks us merely to apply *Young* as we find it.

"General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *1st Westco Corp v. Sch. Dist. of Phila.*, 6 F.3d 108, 113 (6th Cir. 1993). "Consistent with the *Young* requirement of action on the part of the state official, we note that the phrase 'some connection with the enforcement of the act' does not diminish the requirement that the official threaten and be about to commence proceedings." *Children's Healthcare*, 92 F.3d at 1416. These precedents do not foreclose injunctive relief here. Enjoining a statewide official under *Young* based on his obligation to enforce a law is appropriate when there is a realistic possibility the official will take legal or administrative actions against the plaintiff's interests. *Cf. id.*; *1st Westco*, 6 F.3d at 114.

That is the case here. The Secretary of State and members of the State Board of Elections are empowered with expansive authority to "administer the election laws of the state . . . . [and] may adopt administrative regulations necessary to properly carry out its duties." Ky. Rev. Stat. § 117.015(1). They also train state and local personnel on how to implement Kentucky's election laws, *id.* § 117.187(1), which apparently would include instructing other state actors on how to administer this allegedly unconstitutional buffer-zone statute. This too impacts Russell, because "[a]ny precinct election officer, county clerk, deputy county clerk, or any law enforcement official" can enforce § 117.235(3). *Id.* § 117.235(5). Moreover, the record evidence indicates that KSBE routinely partnered with the Attorney General in responding to complaints of improper election activity. *Young*'s enforcement element is not confined to criminal actions, but is satisfied by a government official's execution of a statute in civil actions as well. *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 437 (6th Cir. 2000).

KSBE—of which Secretary Grimes is the Chair—is busily engaged in administering Kentucky's election laws, including § 117.235(3). KSBE *acted* when it promulgated 31 Kentucky Administrative Regulation 4:170, authorizing an exemption to § 117.235(3) for bumper stickers on cars while voting. Defendants do not deny that KSBE is actively involved with administering the statute, and so regularly acts in furtherance of its execution; they instead argue that because Russell cannot predict *specific* actions that KSBE will take that will directly impact Russell, he cannot name them as parties he wishes to enjoin from infringing his political-

speech rights. But that is not what our precedents require. A citizen who wishes to engage in political speech, but is informed by government officers that his speech violates state law, need not prophesy precisely what actions statewide officials actively administering that statute—including promulgating regulations that might impact his ability to speak—will take against him before the Constitution allows him the opportunity to prove that the state law violates the First Amendment. Nor must such an ordinary citizen, in order to vindicate his rights, explain to the court a legal strategy whereby these statewide officials could threaten him without assistance from local officials who bowed out of the litigation by entering into a consent decree. Given KSBE's statutory mandate to administer § 117.235(3), and its undisputed role in effectuating that mandate, Russell's allegations reflect a significant possibility that KSBE's actions to implement this statute would be against his interests vis-à-vis engaging in political speech during elections.

"*Young*'s applicability has been tailored to conform as precisely as possible to those specific situations in which it is necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States." *Papasan v. Allain*, 478 U.S. 265, 277 (1986) (internal quotation marks omitted). This is such a situation. Kentucky's Attorney General, Secretary of State, and State Board members are all subject to suit here under *Ex parte Young*'s exception to Kentucky's Eleventh Amendment sovereign immunity.

**2.**

Denying Defendants' claims of Eleventh Amendment immunity also confirms our jurisdiction to adjudicate this case. "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution . . . ." U.S. Const. art. III, § 2, cl. 1. "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 150 (2010)).

The Kentucky Attorney General has concurrent jurisdiction with county prosecutors to prosecute violations of § 117.235(3). When he filed his complaint, Russell needed only to plead general facts that would suggest that Conway had injured Russell either through actions already taken or actions Russell reasonably feared might be taken as a result of Russell's conduct. *See*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). For preenforcement challenges, Russell must "show that he is under threat of suffering [an] 'injury in fact.'" *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Friends of Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "[I]t is not necessary that [Russell] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." *Steffel*, 415 U.S. at 459. Russell must plead—and in later stages of litigation, prove—"an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

Russell satisfies Article III's requirements with regards to Conway. Russell cites Conway's role in enforcing election laws, and that he fears prosecution. This "fear of prosecution" is sufficient to confer standing when it is "reasonably founded in fact." *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1395 (6th Cir. 1987). Furthermore, "past enforcement [of a statute] against the same conduct is good evidence that the threat of enforcement is not chimerical," *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2345 (2014) (internal quotation marks omitted), especially where the agency tasked with enforcing the statute receives complaints on a relatively frequent basis. Given Defendants' historical conduct, there is certainly a credible threat that Russell could be prosecuted under the statute. After the bench trial, the district court found that Russell was indeed apprehensive about the possibility of prosecution. And because we have Article III jurisdiction to consider Russell's suit against Conway, we need not discuss Russell's standing regarding the other defendants. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981).

**B.**

We turn now to the merits. Two cases control our analysis here: the Supreme Court's decision upholding a 100-foot buffer zone in *Burson v. Freeman*, 504 U.S. 191 (1992), and our subsequent decision invalidating a Kentucky statute creating a 500-foot buffer zone in *Anderson v. Spear*, 356 F.3d 651 (6th Cir. 2004). The Kentucky statute before us today, mandating a 300-foot buffer zone, was enacted as the successor to the one we invalidated in 2004.

The First Amendment commands, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I, cl. 3. This command applies with equal force against the States through the Fourteenth Amendment. *Virginia v. Black*, 538 U.S. 343, 358 (2003). Buffer-zone laws prohibit political speech around polling places on Election Day. "Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (internal quotation marks omitted); *see also McCutcheon v. FEC*, 134 S. Ct. 1434, 1445–50 (2014).[1] Strict scrutiny is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).[2] The burden for justifying such restrictions on speech falls entirely upon the government. *McCutcheon*, 134 S. Ct. at 1452.

In *Anderson* we held that *Burson* imposed a "modified burden of proof" on the State, which is "an important component of the *Burson* analysis, for it stands as the Supreme Court's recognition of the deference due to the states in our federal system of government." *Anderson*, 356 F.3d at 656. The Constitution entrusts to the States the primary role in carrying out elections. *See* U.S. Const. art. I, § 4, cl. 1. We explained:

> The states' ability to conduct elections—particularly for state officers—should not be usurped or interfered with by the federal courts absent a clear violation of the United States Constitution. By modifying the burden, the *Burson* Court recognized that states are uniquely equipped to manage their own elections . . . .

*Anderson*, 356 F.3d at 656. When we apply strict scrutiny in this context, we therefore will hold that a state law satisfies strict scrutiny's narrow-tailoring prong "provided that the response is reasonable and does not *significantly impinge* on constitutionally protected rights." *Burson*, 504 U.S. at 209 (plurality opinion) (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 196 (1986)) (internal quotation marks omitted).

---

[1] Strict scrutiny is the rule so long as the burden is both content-based and viewpoint-neutral. The *Burson* Court upheld a "viewpoint-neutral regulation." *Burson*, 504 U.S. at 214 (Scalia, J., concurring in the judgment). Viewpoint-based restrictions on citizens engaging in such speech on public or private land would be per se invalid. *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).

[2] *Burson* referred to this standard as "exacting scrutiny." *Burson*, 504 U.S. at 198 (plurality opinion).

**1.**

There is no question that the State has compelling interests here. The Supreme Court held that "some restricted zone [for political speech] is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud." *Id.* at 206. "The real question then is *how large* a restricted zone is permissible or sufficiently tailored." *Id.* at 208. In *Burson*, a fractured Court cautiously upheld a 100-foot radius buffer-zone after balancing the need to respect free speech with the need to prevent voter fraud and intimidation. Justice Blackmun's plurality opinion recounted various problems that have plagued the balloting process over time, especially in the early years of the Republic, leading to the secret-ballot process with voter privacy that prevails today. *See id.* at 200–02. The Court sought to protect free speech on one hand, while preventing speech from being used as a means to effectuate fraud or intimidation. "Given the conflict between these [competing priorities], we hold that requiring solicitors to stand 100 feet from the entrances to polling places does not constitute an unconstitutional compromise." *Id.* at 211.

In *Anderson* we faced a functionally identical buffer zone, except that the radius was 500 feet. *Anderson*, 356 F.3d at 651. We explicitly recognized that *Burson* had held that such statutes balance the tension between the two compelling interests of facilitating the franchise while preserving ballot-box integrity. *Id.* at 656–57. We invalidated Kentucky's statute because (1) "the statute is overbroad in that it prohibits speech over too much geography," and (2) "absent a narrowing construction it prohibits more speech than is necessary to meet the State's protected interest." *Id.* at 666. Noting that *Burson* was silent on whether buffer zones could forbid political speech on a citizen's private property, we held that the First Amendment requires that private property must be exempted from the no-speech zone. *Id.* at 662. The parties agree that no narrowing construction is possible for this statute, so if § 117.235(3) fails *Burson*'s version of strict scrutiny, it too must fall.

The First Amendment is "[p]remised on mistrust of government power." *Citizens United*, 558 U.S. at 340. Concerning speech, "a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). Political speech "concerning public affairs is more than self-expression; it is the essence of self-

government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). In the context of elections, "it is our law and our tradition that more speech, not less, is the governing rule." *Citizens United*, 558 U.S. at 361. Indeed, "the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (internal quotation marks omitted). The right against voter intimidation is the right to cast a ballot free from threats or coercion; it is not the right to cast a vote free from distraction or opposing voices.

*Burson* created a 100-foot-radius safe harbor, one that we held in *Anderson* does not encompass barring citizens from allowing political speech on their privately owned land. Since we are examining restrictions of speech on public land, we must consider the public-forum doctrine. The area immediately surrounding a polling booth might lose its character as a *traditional* public forum on Election Day, because the Framers traditionally did not regard such spaces as open for speech during an election. *See Burson*, 504 U.S. at 214–16 (Scalia, J., concurring in the judgment). But the spaces adjacent to this 100-foot radius, which often include sidewalks and streets, are usually traditional public fora. *Id.* at 196 n.2 (plurality opinion). To the extent officials wish to expand a prohibition on speech to encompass this broader area, one which is traditionally open to speech, it is the State's burden to explain why a larger area where political speech is forbidden is appropriately tailored to achieve the compelling interest of preventing election fraud and voter intimidation. We already held that a zone with a 500-foot radius, which covers 25 times the surface area of a zone with a 100-foot radius, is too large. *Anderson*, 356 F.3d at 661. We must now decide whether an intermediate area—nine times larger than what the Supreme Court validated in 1992 but less than half of the area we invalidated in 2004—crosses the constitutional line.

Buffer zones arise from States' attempting to minimize the interference voters face in exercising the franchise. *See Burson*, 504 U.S. at 210. Our holding in *Anderson* invalidating oversized buffer zones is further buttressed—and the State's task in justifying large no-speech zones is made more difficult—by the Supreme Court's subsequent decisions that suggest citizens should be expected to overcome minimal obstacles when voting. Prior to *Burson*, the Court recognized as a countervailing compelling interest that a State "indisputably has a compelling

interest in preserving the integrity of its election process." *Eu*, 489 U.S. at 231. In 2008, the Court again recognized this interest, upholding voter-identification requirements as a permissible burden that does not violate voting rights. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008) (plurality opinion). The Court's approach in *Crawford*—consistent with prior cases—recognizes that the fundamental right of a citizen voter to cast a ballot is accompanied by a concomitant right for each voter not to have his vote sullied by illegal activity. This explains why the Court has repeatedly "upheld generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983). *Crawford* reasoned that the Constitution is not offended by a voter-ID law that "imposes only a limited burden on voters' rights," *Crawford*, 553 U.S. at 203 (plurality opinion), suggesting that citizens cannot demand as a constitutional entitlement an environment in which fulfilling this civic duty is effortless. The right against election fraud—or similar degradations of the integrity of the electoral process—carries the implication that the State may adopt appropriate measures to prevent such fraud, buffer zones being among those measures.

When applying strict scrutiny outside the context of conducting elections, courts generally require a "strong basis in evidence" to support the State's theory. *See Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2423 (2013) (Thomas, J., concurring) (examining the use of racial preferences in college admissions) (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989)) (internal quotation marks omitted). However, *Burson*'s solicitude for state sovereignty regarding elections mitigates the evidentiary burden a State must satisfy, and in this context, a State need not have a strong evidentiary basis for the law to withstand strict scrutiny. To the contrary, the Court held that:

> [e]lections vary from year to year, and place to place. It is therefore difficult to make specific findings about the effects of a voting regulation. . . Thus, requiring proof that [a certain radius] is perfectly tailored . . . "would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action."

*Burson*, 504 U.S. at 209 (quoting *Munro*, 479 U.S. at 195). So while the highest level of scrutiny is still applicable, the State's evidentiary burden is relaxed, and is limited to evidence

demonstrating that the strictures of the law are "reasonable" and do not "significantly impinge" on First Amendment rights. *Id.*

**2.**

We cannot find that the State carried even this relaxed burden in its effort to demonstrate that the 300-foot buffer zone withstands strict scrutiny. There are compelling interests at stake in safeguarding the integrity of the polling booth, and the Supreme Court has held that a 100-foot radius is constitutionally permissible to achieve the State's compelling interests. But Kentucky presented no persuasive argument as to why *Burson*'s safe harbor is insufficient, and instead a 300-foot radius is required to prevent fraud and intimidation. Kentucky did not present any evidence—or even a non-evidentiary policy argument—to the district court justifying a no-speech zone nine times larger than the one previously authorized by the Supreme Court, and offers no well-reasoned argument to our court, either. Indeed, we note that the 300-foot radius of § 117.235(3)'s buffer zone is the numerical midpoint between *Burson*'s 100-foot radius and *Anderson*'s 500-foot radius. Applying this court's reasoning in *Anderson*, we conclude that Kentucky has not carried its burden to prove that this statute is narrowly tailored. *See Anderson*, 356 F.3d at 657–63. The State must do more than split the difference to carry its burden.

The trial court invalidated § 117.235(3) for failing to satisfy strict scrutiny. We affirm that judgment. We do not hold that a 300-foot buffer zone could never be constitutional, though the First Amendment would still require that it exempt speech occurring on private property, *see Anderson*, 356 F.3d at 662, and that it be viewpoint-neutral, *see Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828–36 (1995) (holding that government may not discriminate on the basis of viewpoint when government is neither the speaker nor subsidizing the speech); *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 694 (1992) (holding that speech restrictions in nonpublic fora must be viewpoint-neutral). Rather, we hold that Defendants presented no argument—and evidently the legislature did not engage in factfinding and analysis—to carry their burden to explain why they require a no-political-speech area immensely larger than what was legitimized by the Supreme Court. We therefore hold that Kentucky Revised Statute § 117.235(3) violates the Free Speech Clause of the First Amendment.

## C.

Finally, we must decide whether to invalidate § 117.235(3) facially as well as as-applied. The standard for a facial challenge is normally a daunting one, requiring "the challenger [to] establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Therefore as a matter of judicial restraint and respect for the democratically elected branches of government, courts should facially invalidate statutes "sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (internal quotation marks omitted).

But the First Amendment rule is different under the overbreadth doctrine. That doctrine gives rise to "a type of facial challenge in the First Amendment context under which a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (internal quotation marks omitted). Courts invalidate such statutes in their entirety to prevent a "chilling effect," whereby speakers self-censor protected speech to avoid the danger of possible prosecution. *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (discussing *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). Consequently, because it impairs a substantial amount of speech beyond what is required to achieve acceptable objectives, "a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated." *Citizens United*, 558 U.S. at 336.

We have held that § 117.235(3) is invalid as applied to Russell; it follows that this statute as it is currently constituted is also overbroad. For the very reasons that we explained in the as-applied analysis, *supra*, nothing in the record demonstrates that Kentucky is not impairing protected speech significantly more than is necessary to achieve compelling interests (i.e., that § 117.235(3) does not "chill" the speech of other people). Russell is challenging this statute precisely because it prohibits core political speech over a large geographical area. The State, by failing to carry its burden of demonstrating that § 117.235(3) is reasonable and does not significantly impinge on free speech, has failed the overbreadth challenge. Ordinarily, if we strike down a statute facially, it means that there is no way a State could salvage it, but that general principle does not apply here. Here, if the State were to succeed in carrying its burden to

demonstrate that such a statute does not significantly impinge Russell's free-speech rights, then that same showing would also prove that the State is also not burdening other persons' protected speech substantially beyond what is necessary to achieve compelling interests, resolving the overbreadth question in the State's favor.

This statute is now overbroad in at least two respects. First, *Anderson* held that it is requisite that a buffer-zone law exempts speech occurring on private property, *Anderson*, 356 F.3d at 662—which Kentucky's former 500-foot statute did, *id.*, but this statute curiously does not—and thus prohibits political speech in a greater physical area than the First Amendment allows. And second, on public property that would otherwise be some species of public forum, § 117.235(3) prohibits protected speech over an area greater than the State has demonstrated is necessary to achieve the State's compelling interests. Both substantially burden protected speech beyond what the State has shown is necessary to achieve any compelling public interest. These burdens on protected speech and the chilling effect Kentucky's § 117.235(3) produces accordingly require that the statute be invalidated facially.

## IV.  CONCLUSION

The Eleventh Amendment does not bar this suit against Defendants here, so we have Article III jurisdiction to decide this case. Kentucky Revised Statute § 117.235(3) violates the First Amendment, and is facially invalid because it is overbroad. We therefore AFFIRM the district court.